fact that she was aware the Commonwealth would introduce the other more prejudicial convictions—would have changed her defense strategy. Thus, the Commonwealth's discovery violation does not justify vacating Appellant's sentence because even if Appellant's theft by deception conviction was properly disclosed, a reasonable probability does not exist that the result of her trial would have been different. *See Chestnut,* 250 S.W.3d at 297.

### 2. *Inadmissible Evidence of Appellant's Prior Conviction*

 **M.A.M., Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Nos. 2012–CA–000989–ME, 2012–CA–001165–ME.

Court of Appeals of Kentucky.

April 12, 2013.

As Modified May 31, 2013.

Londa Adkins, Assistant Public Advocate, La Mer Kyle–Griffiths (argued), Assistant Public Advocate, Frankfort, KY, for Appellant.

Jack Conway, Attorney General of Kentucky, Alan J. George (argued), Special Assistant Attorney General, Versailles, KY, for Appellee.

Before MOORE, NICKELL, and TAYLOR, Judges.

## OPINION

MOORE, Judge:

M.A.M., a minor, appeals the Woodford Family Court's orders finding that he violated a Juvenile Status Offender Order, that he was in contempt for doing so,

that the least restrictive means was not a necessary requirement for disposition of contempt findings, and that the proper disposition for M.A.M.'s contempt was his commitment to the Cabinet for Health and Family Services (Cabinet). After a careful review of the record, we reverse because the child's guilty plea was not knowingly, intelligently, and voluntarily entered and because the contempt finding was based upon the child's violation of an invalid court order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

M.A.M., a male child, was twelve years old when the complaint was initiated against him in this case alleging that he had committed the status offense of being beyond control of his parents. In support thereof, the complaint stated as follows: "[H]e runs away from home, whereabouts unknown, he is profane and argumentative with his parents, destroys property within the home and has theft issues[.] He has behavior issues at school.... He has intermittently been in Comprehensive Care since 2006."

The Court Designated Worker's Preliminary Inquiry Formal/Informal Processing Criteria and Recommendations form that was filed with the Complaint stated that the child was charged with the status offense of Beyond Control of Parents, a violation of KRS[1] 630.020(2), and diversion was unsuccessful because the child was leaving home without consent, smoking, stealing, and possibly using drugs.

On November 1, 2011, a Juvenile Status Offender Order (JSOO) was entered against M.A.M., due to the allegation that he was beyond control of his parents. The JSOO stated that the child had appeared in court with counsel, and M.A.M. was ordered as follows:

— Do not leave your home without custodial permission;

— Obey all rules of your home, including a curfew which is 4:00 p.m. to 7:15 a.m.

— Attend all school sessions on time, have no unexcused absences and no behavior problems at school;

— You are to violate no law;

— You are to attend and complete local [No program name specified] program;

— You are to maintain at least passing grades in school;

— You are not to consume, use or possess any alcoholic beverages, tobacco products or illegal drugs;

— You are to submit to random drug testing;

— Other conditions: No contact [with K.S.]; no contact with older kids outside of school or without parent approval[;] no unsupervised contact with younger children in home.

The order also contained form language that stated: "Failure to abide by this Order may result in a contempt finding being made against you by the court which could result in a fine and/or your being placed in secure detention or other alternative placement, and/or ____." The "blank" in the preceding statement was not completed on the JSOO form. Nevertheless, the JSOO was signed by M.A.M., his parent and his attorney, as well as by the court and the county attorney.

An adjudication hearing on the JSOO was scheduled for November 15, 2011, but the court's signed docket entry for that date states that the child appeared with counsel, waived the adjudication hearing,

1. Kentucky Revised Statute(s).

and stipulated to the complaint. Upon review of the video-recorded proceedings from that day, it is apparent that the child's counsel stipulated to the complaint, and the court then told M.A.M. that he was entitled to a hearing, in which witnesses would have to be brought in to show that he used profane language; he was argumentative with his parents; he destroyed property at home; he committed the theft of someone's property; and he ran away from home (whereabouts unknown). The court asked if the child was going to acknowledge having done those things without having a hearing and requiring the testimony of witnesses, to which M.A.M. and his counsel responded in the affirmative.

A disposition hearing was held. The court's signed docket entry for the day of the disposition hearing stated that the child was doing well at school, but at home, he continued to threaten and curse, and he remained violent and destructive. The Cabinet filed a predisposition investigation report stating, *inter alia*, that M.A.M. should remain in his parents' custody subject to the following conditions:

[He] will continue to follow recommendations of his mental health service provider(s);

[he] will continue to comply with taking his prescribed medications;

[he] will continue to participate with Impact services;

[he] will be probated to the court for a period of 1 year;

[he] will continue to follow ALL Status Offender Orders;

[he] will follow ALL court orders and will not obtain any additional charges;

[he] will attend school with no unexcused absences or tardies;

[he] will not have any disciplinary issues or suspensions at school;

[he] will continue to maintain passing grades;

[he] will NOT use tobacco products, alcohol or drugs (except the ones prescribed for him);

[the parents] will insure that [the child] attends school daily and on time or will provide the school with appropriate documentation timely if [he] misses school;

[the parents] will insure that they will provide [the child] with a stable living situation;

[the parents] will follow through with all recommendations made by service providers.

The court approved the Cabinet's aforementioned recommendations and added the following: "no synthetic substances; child to cut bangs to eyebrows; [and] 9:30 p.m. bedtime."

A review hearing was held on February 7, 2012, and the court's signed docket sheet stated, *inter alia*, that the child was reported to be a good student, except he had a 64 average in World Civilizations; the discipline referral was not working; the parents reported that the child was better at home but he had been smoking at church; the parents were to meet with Morgan Law regarding IMPACT; and the child could return to middle school the following week.

On March 20, 2012, the Commonwealth moved the court to hold the child in contempt "for leaving his home without permission on March 13, 2012, at approximately 4:30 p.m., and remaining with whereabouts unknown until his return at approximately 9:00 p.m., with a pellet gun in hand." Subsequently, on May 10, 2012, the Commonwealth filed an addendum to its motion for contempt, in which it alleged that the child's therapist reported that, according to the child's mother, M.A.M. "is constantly out late, whereabouts unknown,

to the point that whereas she used to go out driving looking for him, she has given up doing so." The addendum also stated that the child's father had contacted the attorney for the Commonwealth and reported the following:

— Since February 27, 2012, [the child had] violated curfew 25 times.

— On two occasions, he returned home with a pellet gun.

— He was going to [K.S.'s] home.

— Police officers had to return [M.A.M.] on at least two occasions, and he was believed to have consumed alcoholic beverages on one of those.

— He is smoking every day, and stealing cigarettes, lighters, and alcohol.

— He has destroyed family property.

A contempt hearing was held on May 15, 2012, but because the child's legal counsel had not had sufficient time to prepare for the allegations lodged in the addendum, the court only considered the allegations in the initial motion for contempt on that day. The court found the child in contempt when the child left his home after curfew and did not return until later, and his whereabouts were unknown during that time. The child was ordered to be committed to the Cabinet until further notice, and ordered the Cabinet to conduct a 72-hour report pursuant to KRS 630.080(3) concerning further services. The family court stated that another hearing would be held on May 23, 2012, for the purpose of considering the addendum to the motion for contempt and for a determination of the disposition of the finding of contempt.

In accord with its verbal orders during the May 15, 2012 hearing, the family court entered a temporary custody order finding that the child had violated court orders, including committing violations of the curfew the court had set in its order of November 1, 2011. The form order of May 15, 2012, stated that the court found the child was a danger to himself or to the community, and that it was not in his best interest to continue in the home. The order stated the child was "in such condition or surroundings that his ... welfare is being harmed or threatened with harm to such a degree that his ... best interest requires that custody be changed from the original custodian to another suitable custodian." The court also found that "[r]easonable efforts were made to prevent the child's removal from the home." Thus, temporary custody of M.A.M. was granted to the Cabinet, and the Sheriff was ordered to transport the child to Gateway in Mt. Sterling, Kentucky.

On May 23, 2012, a hearing was held to address the allegations lodged in the addendum to the motion for contempt. After taking testimony regarding the allegations, the court announced during the hearing that the child had been orally informed during the November 1, 2011 JSOO hearing what the consequences would be if he violated that order, and the child had signed that order, thereby acknowledging he understood what the consequences would be if he violated it. The court stated it had told M.A.M. about the possibility of jail and that he might be removed from his home if he violated the JSOO. The court found the child should be committed to the Cabinet and he should be placed in a facility where he will have to complete a program that addresses both his mental health issues and his lack of respect for his parents. After completing the program, the court stated it hoped M.A.M. could return to a normal life attending high school. M.A.M.'s counsel argued that the least restrictive alternative should be applied to the child, but the court held that the least restrictive alternative was inapplicable to this situation. The court set another hearing for June 19, 2012.

The signed docket entry concerning the May 23, 2012 hearing states:

(1) A valid court order was entered on 11/1/2011, juvenile was present and represented by appointed counsel when verbally advised of the terms of the Juvenile Status Offender Order, the consequences of violation was part of the order signed by juvenile certifying he understood the orders.

(2) Child violated valid court [order] beyond a reasonable doubt, see specific order.

(3) Disposition on initial contempt finding commitment to [the Cabinet].

The family court entered a Juvenile Status or Delinquency Disposition order on May 23, 2012, stating that the court had found, beyond a reasonable doubt, that M.A.M. had violated KRS 600.020(60), in that: "Child left his home without parent permission; violated curfew orders when he left his home without a parent or adult approved by parent after 4 p.m.; consumed alcohol, tobacco and marijuana; violated home rules by damaging walls, threatening family members and/or calling mother derogatory names."

The order further provided the court found that reasonable efforts were made to prevent M.A.M.'s removal from the home and that "[c]ontinuation in the home is contrary to the welfare of the child or removal from the home is in the best interest of the child." The court adopted the recommendations in the disposition report that was attached to the order and committed the child to the Cabinet as a status offender. The family court recommended "that child be placed in a facility for proper structure and learn to handle authority properly and address his mental health needs."

M.A.M. filed a notice of appeal from the family court's May 23, 2012 disposition or-

der. That case is now case number 2012–CA–000989–ME in the present appeal.

The June 19, 2012 disposition hearing was then held and the court's signed docket entry following that hearing states as follows: "Adopt [pre-disposition report] child remains committed to [the Cabinet] least restrictive means is not a necessary requirement for disposition of contempt findings." The docket entry also stated "Buckhorn Children's Home has 6 phases."

The child filed another notice of appeal, this time concerning the court's June 19, 2012 disposition order. That case is before us in this appeal as case number 2012–CA–001165–ME. The child's two appeals were consolidated, and they are now before us for review. M.A.M. raises the following claims in the present appeal: (a) his stipulation was accepted by the family court in violation of Sections Two and Three of the Kentucky Constitution and the Fourteenth Amendment to the United States Constitution because there was no affirmative showing that he knowingly, intelligently and voluntarily entered the plea; (b) the family court erred in committing M.A.M. to the Cabinet for contempt because the original disposition did not include possible commitment; (c) the family court's order placing M.A.M. in the Cabinet's custody for contempt of court violated the Juvenile Code and Due Process of Law under Sections Two and Eight of the Kentucky Constitution and the Fourteenth Amendment to the United States Constitution; and (d) the family court erred when it committed the child to the Cabinet because the record did not support a finding that this was the least restrictive alternative.

## II. ANALYSIS

### A. STIPULATION AND VALIDITY OF PLEA

M.A.M. first contends that his stipulation was accepted by the family court in

violation of Sections Two and Three of the Kentucky Constitution and the Fourteenth Amendment to the United States Constitution because there was no affirmative showing that he knowingly, intelligently and voluntarily entered the plea. The stipulation to which M.A.M. is referring occurred during the November 15, 2011 adjudication hearing concerning the JSOO. As we mentioned earlier, the court's signed docket entry for that date states that the child appeared with counsel, waived the adjudication hearing, and stipulated to the complaint. Our review of the video-recorded proceedings from that day reveals that the child's counsel had a discussion with the child, which was inaudible on the video recording. Counsel then stipulated to the complaint, and the court told M.A.M. that he was entitled to a hearing, in which witnesses would have to be brought in to prove that he used profane language, he was argumentative with his parents, he destroyed property at home, he committed the theft of someone's property, and he ran away from home (whereabouts unknown). The court asked if he was going to acknowledge having done those things without having a hearing and requiring the testimony of witnesses, to which M.A.M. and his counsel responded in the affirmative. The court informed M.A.M. that the next hearing would be a dispositional hearing, which is similar to a sentencing hearing for an adult. The child was told that if he behaved well before that hearing, the court would not place a lot of restrictions on him. However, if the report was bad, then he would have a lot of restrictions. If M.A.M. later violated those restrictions, then he could go to jail or he could be removed from his home and placed in the Cabinet's custody.

M.A.M. acknowledges that this claim is unpreserved, but he asks us to review it for palpable error. Kentucky Rule(s) of Criminal Procedure (RCr) 10.26 provides

as follows: "A palpable error which affects the substantial rights of a party may be considered ... by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." This claim essentially argues that the family court did not conduct the proper colloquy under *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), to determine whether M.A.M.'s stipulation to the charges in the JSOO was voluntarily, intelligently, and knowingly entered.

As applied and analyzed in *J.D. v. Commonwealth*, 211 S.W.3d 60, 62 (Ky.App. 2006),

> *Boykin* is the seminal case in the arena of the validity of a guilty plea. In *Boykin*, the U.S. Supreme Court stated that "[s]everal federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial.... We cannot presume a waiver of these [ ] important federal rights from a silent record." [*Boykin*] 395 U.S. at 243, 89 S.Ct. 1709. The Supreme Court ultimately held that the trial court committed error when it "accept[ed] petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." *Id.* at 242, 89 S.Ct. 1709. In *D.R.* [*v. Commonwealth*, 64 S.W.3d 292 (Ky.App.2001) ], this Court stated that "it [is] beyond controversy that *Boykin* [ ] applies to juvenile adjudications." 64 S.W.3d at 294, FN2. The *D.R.* court went on to state that:
>
> > The validity of a guilty plea must be determined not from specific key words uttered at the time the plea was taken, but from considering the totality of circumstances surrounding the plea.... These

circumstances include the accused's demeanor, background and experience, and whether the record reveals that the plea was voluntarily made.

*Id.* at 294.

The Sixth Circuit Court of Appeals has also weighed in on this issue in a federal case arising out of the Western District of Kentucky, for which the juvenile had counsel. In *Laswell v. Frey,* 45 F.3d 1011, 1015 (6th Cir.1995), the court stated:

> Upon review, this Court notes that an adjudication demands a determination of the truth or falsity of the allegations, and that a determination of the truth requires more than the simple verbal admission at the detention hearing at issue in the instant case. The Court is persuaded that, because no inquiry was made of the veracity of the charges or admission, because no inquiry was made to determine if "the plea" was voluntarily made, and because no inquiry was made as to the nature of the charges, that the proceedings cannot later be transformed from a determination of probable cause for detention into an acceptance of a valid guilty plea.

Our review of the record reveals that the district court explained J.D.'s *Boykin* rights to him only during the August detention hearing related to the terroristic threatening charge. However, the district court did not specifically review these rights in the context of his decision to admit to both the terroristic threatening and assault charges the following month. In fact, J.D. had never been apprised of his *Boykin* rights in relation to either the assault or beyond control charges. Thus, there is no evidence in the record to establish that his admission to the charges was voluntary and intelligent at the time it was entered. The situation in this case is quite similar to those of *D.R.* and *Laswell,* although J.D. was represented by counsel, unlike D.R. in his case.

The record in the present case shows that under any test, the bare minimum for compliance with *Boykin* was not met. We recognize that juvenile proceedings are by nature less formal than adult proceedings; and we are aware of the great number of cases most district judges handle. *However, juvenile adjudication proceedings must meet constitutional muster,* and this one does not. There was no colloquy whatsoever; and from the record it appears that the juvenile's attorney responded to the district judge's questions at the adjudication. Under KRS 610.080(1), "[t]he adjudication **shall determine the truth or falsity of the allegations in the petition and shall be made on the basis of an admission or confession of the child to the court** or by the taking of evidence." (Emphasis added).

Based upon binding precedent, we must hold that the district court improperly accepted J.D.'s admission of guilt without first informing him of his *Boykin* rights at the time it accepted the plea, a step necessary to establishing that his plea was voluntary and intelligent. Accordingly, the district court should have granted J.D.'s motion to set aside the adjudication and disposition. The circuit court, in turn, committed reversible error in affirming the district court's ruling.

(Underline and emphasis added; internal notes omitted).

In *D.R. v. Commonwealth,* 64 S.W.3d 292 (Ky.App.2001), this Court noted:

Since pleading guilty involves the waiver of several constitutional rights, including

the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers, a waiver of these rights cannot be presumed from a silent record. The court must question the accused to determine that he has a full understanding of what the plea connotes and of its consequences, and this determination should become part of the record.

*D.R.*, 64 S.W.3d at 294 (quoting *Centers v. Commonwealth*, 799 S.W.2d 51, 54 (Ky. App.1990)).

■ In the present case, the family court made no inquiry during the November 15, 2011 adjudication hearing as to the veracity of the charges or of the child's stipulation, and no inquiry was made as to whether M.A.M.'s stipulation was voluntary or coerced. Nor did the court inform the child during that hearing and before accepting his plea of what the possible consequences, in terms of the range of punishments, would be if he admitted his guilt. The child was a twelve-year-old who apparently had no prior experience with the court system. Therefore, we find that M.A.M.'s plea was not entered voluntarily, intelligently, and knowingly. We further find that this error by the family court amounts to palpable error, thus requiring reversal of M.A.M.'s guilty plea. *See generally D.G. v. Commonwealth*, 355 S.W.3d 476 (Ky.App.2011).

## B. COMMITMENT FOR CONTEMPT BASED UPON ORIGINAL DISPOSITION

■ M.A.M. next asserts that the family court erred in committing him to the Cabinet for contempt because the original disposition did not include possible commitment. He acknowledges that this claim was not preserved for our review, but he asks us to review it for palpable error.

M.A.M. is correct that the original disposition in his case did not mention possible commitment. However, the family court's finding that the child was in contempt was not based upon his violation of the disposition order, but upon his violation of the original JSOO entered on November 1, 2011, *i.e.*, prior to his adjudication and disposition. Therefore, this claim lacks merit because the contempt order was not based upon the original disposition.

## C. LEGALITY OF PLACEMENT INTO CABINET'S CUSTODY

Next, M.A.M. alleges that the family court's order placing him in the Cabinet's custody for contempt of court violated the Juvenile Code and Due Process of Law under Sections Two and Eight of the Kentucky Constitution and the Fourteenth Amendment to the United States Constitution. It is important to note that M.A.M. does not challenge the court's determination that he was in contempt based upon the JSOO of November 1, 2011. Rather, he alleges that commitment to the Cabinet for his contempt was an excessive punishment and that the court only has the authority to commit a child to the Cabinet via an Emergency Custody Order and a finding that adheres to the Juvenile Code, which he contends were not done in this case.

■ The child cites KRS 610.010(9) in support of his argument, which he claims "expressly states that 'no emergency removal or temporary custody orders shall be effective unless the provisions of KRS Chapter 620 [the Dependency, Neglect, and Abuse (DNA) Chapter] are followed.'" However, the child's argument is misplaced because, in quoting the statute, he omitted a condition that precedes the aforementioned language in KRS 610.010(9), which actually states, in perti-

nent part: "if the case involves allegations of dependency, neglect, or abuse, no emergency removal or temporary custody orders shall be effective unless the provisions of KRS Chapter 620 are followed." The present case is not a dependency, neglect, or abuse action. Accordingly, M.A.M.'s reliance upon KRS 610.010(9) and KRS Chapter 620 is misplaced in this contempt action, which is based upon a status offender order.

■ The Commonwealth responds to M.A.M.'s allegations by arguing that the contempt finding in this case was proper because even if the adjudication and disposition were not proper, the child nevertheless violated the court's JSOO, which was entered November 1, 2011, *i.e.*, prior to his adjudication and disposition. We note that the JSOO was based merely on the *allegations* against the child: The JSOO form in this case was check-marked in the box that stated the child "is alleged to be ... Beyond Reasonable Control of Parents"; and it was not check-marked in the box on the form that provides the child "has been found to be a status offender." Therefore, the JSOO was based solely on allegations, and not on any actual findings made by the family court. Consequently, we need to determine whether the JSOO was a valid court order, the violation of which would justify the family court's finding of contempt against the child.

A child may be held in contempt of court for violating "valid court orders previously issued by the court[ ]" KRS 610.010(11). A "valid court order" is defined as:

[A] court order issued by a judge to a child alleged or found to be a status offender:

(a) Who was brought before the court and made subject to the order;

(b) Whose future conduct was regulated by the order;

(c) Who was given written and verbal warning of the consequences of the violation of the order at the time the order was issued and whose attorney or parent or legal guardian was also provided with a written notice of the consequences of violation of the order, which notification is reflected in the record of the court proceedings; and

(d) Who received, before the issuance of the order, the full due process rights guaranteed by the Constitution of the United States.

KRS 600.020(64).

Additionally, KRS 630.070 provides: "No status offender shall be placed in a secure juvenile detention facility or juvenile holding facility as a means or form of punishment except following a finding that the status offender has violated a valid court order."

In the present case, M.A.M. was brought before the court and made subject to the JSOO, and his future conduct was regulated by the JSOO: The JSOO ordered M.A.M. to do, or refrain from doing, certain things, as set forth *supra*. Additionally, the child was given written and verbal warnings of the consequences of violating the JSOO. The JSOO specifically stated that "[f]ailure to abide by this Order may result in a contempt finding being made against you by the court which could result in a fine and/or your being placed in secure detention or other alternative placement." Furthermore, the JSOO ordered the "Parent or Guardian ... to see that the juvenile complies with all of the orders contained herein and you shall notify the Court of any violations." The JSOO was signed by the family court, the child, a parent, the child's attorney, and the Coun-

ty Attorney.[2] Consequently, the only question remaining in our analysis of whether the JSOO was a valid court order is whether the child received the full due process rights guaranteed by the United States Constitution before the order was entered.

Clearly, the child did not get an adjudication hearing before the JSOO was entered, because the adjudication hearing occurred at a later date. In the present case, the JSOO was entered based solely on the allegations against the child. M.A.M. did not receive his full due process rights before the order was entered. Consequently, the JSOO was not a valid court order, and the child could not be held in contempt for violating it.

Alternatively, even if we were to assume for the sake of argument that the JSOO was a valid court order, it nevertheless was essentially a pretrial order. Common sense dictates that once an adjudication and disposition have occurred, any pretrial orders are null and void as stand-alone orders.[3] Thus, M.A.M. also could not have been found in contempt for violating an order that was null and void.

Therefore, because the JSOO was not a valid court order, M.A.M. should not have been held in contempt for violating it. Furthermore, the family court erred in committing the child to the Cabinet because the decision to commit him to the

Cabinet was based upon his violation of an invalid court order.

## D. LEAST RESTRICTIVE ALTERNATIVE

Finally, M.A.M. argues that the family court erred when it committed him to the Cabinet because the record did not support a finding that this was the least restrictive alternative. However, we need not address this claim because we have previously held that the court erred in committing the child to the Cabinet for contempt. Therefore, this claim is moot.

Accordingly, the Woodford Family Court's orders are reversed, and this case is remanded for further proceedings.

ALL CONCUR.

---

**2.** The record before us contains no explanation why the court held the child in contempt for violating the JSOO, but did not hold the parents in contempt for violating the JSOO by failing to report the child's violations of the JSOO to the court within a reasonable time. Although the original motion for contempt was based upon an alleged violation of the JSOO that occurred just one week prior to the date the motion was filed, the addendum to the motion for contempt was based upon the child's repeated violations of the JSOO over a

period of approximately two-and-one-half months before the addendum was filed, and it included allegations that the child had violated curfew (and, accordingly, the JSOO) twenty-five times during that time period.

**3.** The family court incorporated the JSOO by reference into its disposition order, which normally would have made the JSOO part of the disposition of the case. However, the disposition order itself was invalid, as discussed *supra*.